**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LYNYA COOPER, *individually and as administrator of the Estate of Trebora Talbert*, | ) ) ) | |
| Plaintiff, | ) | CASE NO. 23-cv-4891 |
| | ) | |
| v. | ) | |
| | ) | |
| CHICAGO HOUSING AUTHORITY, | ) | JURY DEMAND |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiff Lynya Cooper, individually and as administrator of the Estate of Trebora Talbert, by her undersigned counsel, respectfully submits the following Complaint against Defendant Chicago Housing Authority ("CHA"):

**INTRODUCTION**

1.      As a result of Defendant CHA's refusal to provide a reasonable accommodation, Plaintiff and her daughter were forced to spend much of the last two years of her daughter's life in an inaccessible second-floor apartment that only amplified the pain and suffering of their already heartbreaking situation. Plaintiff brings this action for damages based on Defendant's failure to accommodate under the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, Rehabilitation Act, 29 U.S.C. § 701, *et seq.*, Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and Illinois Human Rights Act, 775 ILCS § 5/101, *et seq.*

**PARTIES, JURISDICTION, AND VENUE**

2.      Plaintiff Lynya Cooper is the mother of the late Trebora Talbert and the administrator of Trebora's estate. Ms. Cooper is a resident of this judicial district.

3.      Defendant CHA is a municipal corporation in this judicial district.

4.     The Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1367.

5.     Venue is proper, as the parties are residents of this judicial district and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## THE CHICAGO HOUSING AUTHORITY

6.     CHA is responsible for providing housing to low-income families in the City of Chicago, generally including those families whose household income does not exceed 80% of the area median income (AMI).

7.      As the largest owner of rental units in Chicago, CHA has over 15,000 public housing units throughout the City and a budget of over $1 billion.

8.     With over 15,000 public housing units, CHA has historically maintained a high vacancy rate.

9.     An audit performed by the CHA Inspector General in 2017 showed that CHA's vacancy rate was at an "F" grade according to historical performance indicators from the Department of Housing and Urban Development (HUD).

10.     The audit likewise showed that the length of time units remained vacant was 13 months on average, well beyond recommended HUD guidelines.

11.     In 2021, the CHA Inspector General began another audit in response to a complaint that a four-bedroom single-family house owned by CHA had remained vacant for over a decade.

12.     The audit showed that, as of September 2021, CHA's vacancy rate remained very high at 14.63%, which was well above the HUD national standard of 4%.

13.     The audit showed that units continued to remain vacant for an extended period of time, with over 1,000 units vacant for over a year.

## THE FAILURE TO ACCOMMODATE TREBORA AND HER MOTHER

14.     Trebora and her mother lived in a second-floor unit of a CHA public housing building at 121 N. Wolcott in Chicago.

15.     Trebora suffered from a progressive neurological disease that ultimately led to her death on or about September 3, 2022.

16.     In the years before Trebora passed, Trebora's progressively deteriorating medical condition rendered her unable to walk or perform everyday activities for herself.

17.     Trebora required a number of different pieces of medical equipment and supplies to help with her everyday activities, including a hospital bed, Hoya lift, Sara Stedy, wheelchair, walker, portable commode, lift commode seat, commode safety frame, transfer shower bench, adjustable safety bath rail, and boxes of monthly medical and feeding supplies.

18.     Trebora had difficulty getting through the door to her unit in her wheelchair, because the door was not wide enough.

19.     Trebora could not use the stairs to her apartment without assistance. Ms. Cooper had to call a private ambulance company or the Chicago Fire Department just so Trebora could get to and from her frequent medical and therapy appointments at the Northwestern University Chicago campus.

20.     Given the difficulty transporting Trebora, it was vital for Trebora to remain in close proximity to her treaters at the Northwestern University Chicago campus.

21.     Trebora's medical condition also rendered her more susceptible to adverse environmental conditions, which made it especially important that Trebora have a safe, sanitary, and stable living environment.

22.    On July 6, 2020, Ms. Cooper notified CHA's property manager that she and Trebora were in need of an emergency move to an accessible apartment due to Trebora's medical condition. This request included a third bedroom, which was necessary to accommodate the medical equipment and supplies Trebora needed to function.

23.    On July 9, 2020, Ms. Cooper provided CHA's property manager with a note from Northwestern Medicine stating as follows:

> Ms. Trebora Talbert…remains under our care at Northwestern Medicine for a progressive neurological disease. Currently, Ms. Talbert lives in a small apartment with stairs to enter. Ms. Talbert's physical needs have increased and she is now unable to navigate stairs. Additionally, Ms. Talbert requires assistive devices such as a walker and wheelchair. Ms. Talbert's needs are expected to increase over time.
>
> Please provide alternative living arrangements for Ms. Talbert either with no stairs to enter/no stairs in the home or access to an elevator-equipped, wheelchair accessible building. She will require adequate room for medical equipment such as a hospital bed, wheelchair, commode and storage of additional medical equipment. Ms. Talbert's mobility needs will require additional room for navigating with a wheelchair as well. Ideally, the unit is equipped with safety bars in the bathroom or permission from housing management to install safety bars…

24.    On July 13, 2020, CHA's property manager informed Ms. Cooper that "[CHA] needs a letter from you explaining why you need a 3 Bedroom accessible unit. He also wants you to list all of your daughter's additional medical equipment she needs to justify the reason you will need to stay in a (3) bedroom size unit."

25.    On July 14, 2020, Ms. Cooper provided CHA's property manager a list of medical equipment she knew Trebora would require and indicated that she was waiting for a list from Trebora's doctor, because even more equipment might be needed.

26.    On or about July 21, 2020, CHA offered a unit at 3650 W. Congress. Ms. Cooper declined the unit, because it was not big enough for Trebora to move around in her wheelchair, the bedrooms were too small for Trebora's medical equipment, and there was insufficient room for

Trebora's medical supplies. Ms. Cooper was also concerned about the safety of the property, as she observed a boxing match in the parking area when she drove by the property.

27.      In August 2020, CHA offered a unit at 812 E. 131 St., which was well too far away for Trebora to reasonably travel to the Northwestern campus located in downtown Chicago. Ms. Cooper accordingly declined the unit.

28.      On or about August 17, 2020, Ms. Cooper provided CHA with a letter from one of Trebora's treaters making clear that Trebora needed to remain in close proximity to the Northwestern campus:

> Ms. Talbert…is a patient under my care at the Shirley Ryan AbilityLab. Due to her medical condition, she requires use of a wheelchair and assistance with all activities of daily living and mobility. She will require ongoing close management and monitoring by her medical and rehabilitation teams at Northwestern Memorial Hospital and Shirley Ryan AbilityLab.
>
> For her safety and the safety of her caregiver as well as ongoing access to needed care, I am writing this letter to request a closer location for the accessible housing that will accommodate the needed equipment and supports for Ms. Talbert so that she can continue to seamlessly access her ongoing required treatment.

29.      On or about August 24, 2020, a charge of disability discrimination was filed on behalf of Trebora with HUD and the Illinois Department of Human Rights (IDHR).

30.      On or about August 26, 2020, CHA issued a letter to Ms. Cooper, which falsely portrayed the reasons the units at 3650 W. Congress and 812 E. 131 St. were declined. The letter stated:

> Dear Ms. Cooper:
>
> This letter is a follow up to CHA's letter of determination for your Request for Reasonable Accommodation that was approved on July 20, 2020 for a transfer to a three-bedroom mobility unit due to the disability of a family member.
>
> Since your approval, CHA has made the following unit offers to you in an attempt to satisfy your request:

1. On July 27, 2020, 3650 W. Congress, Unit 102: you declined, telling property management that you were declining the three-bedroom unit because you felt the unit was too small to fit your furniture.
2. On August 4, 2020, 812 E. 131st St.: you declined for the reason that you felt the area was unsafe.

CHA policy is that if a conforming unit offer is made, and the unit declined for reasons unrelated to the accommodation, then no additional offers need to be made…

31.     Contrary to CHA's letter, Ms. Cooper did not decline the unit at 3650 S. Congress because she wanted more room for "furniture." Ms. Cooper declined this unit because it did not afford sufficient room for Trebora to move in her wheelchair or for Trebora's medical equipment and supplies.

32.     Although Ms. Cooper was concerned that the unit at 812 E. 131 St. was in an unsafe area (a valid concern related to Trebora's medical condition), Ms. Cooper also made clear that the unit at 812 E. 131 St. was too far from the Northwestern campus.

33.     CHA concluded the letter by stating that CHA would make one final unit offer "as a courtesy":

…However, as a courtesy, CHA will make one final unit offer to you in an attempt to satisfy your reasonable accommodation request. CHA is offering a three-bedroom mobility unit located at: **2646 W. 13th St Unit 102**. This is the final offer that will be made…

34.     The unit at 2646 W. 13th St. was likewise not suitable, including because it was in poor condition and dirty, the bathrooms did not have grab bars, the carpet made it difficult for Trebora to move around in her wheelchair, and it was farther from Trebora's medical team at the Northwestern campus.

35.     On or about October 13, 2020, an attorney for Ms. Cooper informed CHA that the unit at 2646 W. 13th St was not acceptable.

6

36.     On January 11, 2021, CHA emailed Ms. Cooper's attorney that CHA would be offering another unit.

37.     When Ms. Cooper's attorney asked whether CHA could provide a ballpark estimate of when the unit would be identified, the CHA representative responded "I have no timetable at this time."

38.     On or about February 26, 2021, Ms. Cooper again filled out paperwork requesting transfer to a new unit.

39.     On or about March 19, 2021, CHA told Ms. Cooper through IDHR that the unit at 2646 W. 13th St. was still available.

40.     Although the unit at 2646 W. 13th St. did not appropriately accommodate Trebora and Ms. Cooper, it was at least on the first floor.

41.     Ms. Cooper and Trebora were willing to transfer to the unit at 2646 W. 13th St. if there were no other options.

42.     The property manager for 2646 W. 13th St., however, informed Ms. Cooper that the unit was not available.

43.     And on or about April 12, 2021, CHA confirmed that the unit at 2646 W. 13th St. was not available.

44.     On April 12, 2021, Ms. Cooper emailed the CHA Ombudsman asking "Can you please advise me as to what steps to take next."

45.     The CHA Ombudsman replied "After further investigation the Office of the Ombudsman has been informed that there is an active HUD 504 investigation and an open IDHR case. As a result of these investigations, the Office of the Ombudsman can no longer assist with

your case. Please forward any questions and concerns that you may have to your investigator on this case who will then forward to CHA legal."

46. On or about April 21, 2021, Ms. Cooper emailed the CHA property manager asking "do I need to fill out the paperwork again regarding an accessible unit? If not who should I contact regarding the matter of Trebora not being able to leave the property without ambulatory assistance? I have attached another letter from Trebora's Doctor regarding her disability so that the management office is updated and aware of our need for a unit."

47. The letter from Trebora's doctor at Northwestern Medicine stated as follows:

I am writing on behalf of my patient, Trebora G. Talbert. Trebora has been under my care for close to 10 years. It is my understanding that the patient has been placed in housing that is not suitable for her current medical condition. It is also my understanding that we have reached out in the past regarding these concerns. I am now reaching out because Trebora has been recently hospitalized due to increasing weakness of her lower extremities. Trebora's mobility is severely compromised at this point, more so than it has been in the past. She is certainly unable to climb stairs and will need handicap access to her home. I am writing to request consideration for placement into housing that will be suitable for her medical conditions and all necessary medical equipment.

48. The property manager declined to respond to the substance of Ms. Cooper's email, stating that "We have been informed that there is an active investigation by the Illinois Department of Human Rights. Please forward any questions you may have regarding your request to the assigned investigator so that they may be addressed with CHA legal."

49. On or about April 29, 2021, a virtual meeting was held with CHA, IDHR, and Ms. Cooper. During the meeting, CHA offered a unit at 511 W. Elm St. that was under construction and would become available possibly by June or July 2021.

50. The 551 W. Elm unit was located close to the Northwestern Chicago campus.

51. On or about May 14, 2021, Ms. Cooper informed CHA through IDHR that she would accept the 551 W. Elm unit.

52.     On or about July 6, 2021, CHA issued Ms. Cooper a letter formally offering a three-bedroom, full-mobility unit at 551 W. Elm St. The letter stated as follows:

Dear Ms. Cooper:

The CHA is pleased to offer you a three-bedroom, full mobility unit located at:

**551 West Elm Street Unit 607**

This unit is being offered to you as part of our ongoing effort to meet your requested accommodation and place you in a unit that is mobility accessible, large enough to accommodate your family member's medical equipment, and close enough to your family member's doctors.

As a reminder, this is the same unit that we discussed during our teleconference on April 29, 2021. Subsequent to our teleconference, you agreed to accept this unit subject to your inspection.

...Once you view the unit, please notify us within 48 hours whether you decide to accept or decline the unit offer.

I Lynya Cooper _____Accept

_____ _____Decline…

53.     Ms. Cooper immediately accepted the 551 W. Elm unit by singing her name on the line for "Accept" on the CHA's letter.

54.     On July 7, 2021, however, Ms. Cooper received an email from CHA's property manager, informing her that she needed to submit an application for the 551 W. Elm unit, including proof of income.

55.     Ms. Cooper submitted an application with an employment verification letter showing her earnings in 2020 and year to date in 2021.

56.     The employment verification letter showed that Ms. Cooper's 2020 wages were $29,241.83 ($18,591.24 regular / $10,650.59 overtime).

57.     The employment verification letter showed that Ms. Cooper's 2021 wages were $20,115.08 through July 15 ($13,969.64 regular and $6,145.44 overtime).

58.     It was difficult to predict what Ms. Cooper's income would be in the rest of 2021 because she often had to take time off from work to care for Trebora.

59.     In fact, Ms. Cooper stopped working on July 19, 2021 so that she could care for Trebora.

60.     Nevertheless, on July 26, 2021, CHA's property manager issued a letter to Ms. Cooper stating that her application for the 551 W. Elm unit was rejected, because her (projected) total household income exceeded 50% of AMI or $37,300.

61.     CHA's property manager did not explain to Ms. Cooper why her household income could not exceed 50% of AMI.

62.     On or about September 16, 2021, CHA informed Ms. Cooper through the IDHR that it would start a search for a new unit based on the income CHA had on file.

63.     On or about November 21, 2021, Ms. Cooper notified CHA's property manager that Trebora would soon be coming home from Shirley Ryan AbilityLab with a motorized wheelchair, and it would be difficult for Trebora to move because the door to their apartment was not even wide enough for Trebora's original wheelchair. Ms. Cooper asked CHA's property manager if someone could find out what steps she needed to take for an accommodation.

64.     CHA's property manager replied that it would forward Ms. Cooper's request to the CHA service provider.

65.     On or about December 21, 2021, Ms. Cooper emailed CHA, because she had not received an update about her request for accommodation. Ms. Cooper advised CHA that Trebora would be receiving a motorized wheelchair, and that Ms. Cooper was unsure how she would be able to get the wheelchair out of the apartment. Ms. Cooper asked CHA to advise her of the next steps in the reasonable accommodation process.

66.    On January 13, 2022, CHA issued a letter to Ms. Cooper stating that "your income did not meet the application criteria for the unit located at 551 W. Elm St," but that "CHA would now like to extend a unit offer for a unit located at: 4322 S. Paulina St, unit #A."

67.    Again, however, the unit CHA offered was farther away from the Northwestern Chicago campus and the unit's bedrooms were too small to accommodate Trebora's medical equipment. The hallway also was not wide enough to allow Trebora to fully maneuver in her wheelchair, and there was a sewer smell throughout the unit. Ms. Cooper therefore did not accept the unit.

68.    On March 11, 2022, CHA issued a letter to Ms. Cooper stating "it has been determined that CHA has made five (5) unit offers to you in an attempt to accommodate your request and each offer that CHA has made has been declined by you for a variety of reasons not related to your original request. Due to these reasons, CHA will be making no further unit offers to you and will consider your RA satisfied with a conforming offer even though you chose not to accept any unit offers."

69.    On or about May 25, 2022, Ms. Cooper again submitted paperwork requesting a transfer to another unit.

70.    On July 5, 2022, CHA issued a letter to Ms. Cooper stating that her request to transfer to another unit was approved, but that her request for a unit close to the Northwestern Chicago campus was denied.

71.    The letter remarkably claimed that there was no need for Trebora to remain close to her treaters at the Northwestern campus, because "there is no connection how being close to the doctor alleviates a disabling condition":

> …However, your request to transfer to a unit in a specific geographic area is denied as CHA does not permit residents to determine what units will be offered to meet

11

the need of the request which in this case is the need for a unit on the a lower floor or an elevator with accessible features  There is no nexus for the request to be placed in a unit close to the doctor as there is no connection how being close to the doctor alleviates a disabling condition…

72.     The letter concluded by claiming "[a]t the present time, CHA does not have any three-bedroom mobility units in your desired area and there is no timetable for when one will become available."

73.     Two weeks later, on July 19, 2022, CHA issued a letter to Ms. Cooper again offering her the unit at 4322 S. Paulina, even though Ms. Cooper had already informed CHA that it did not meet Trebora's needs.

74.     In the letter, CHA stated "Only one-unit offer will be made, and if you decline the unit for a reason not related to what you were approved for, your RA will be closed, and no further offers will be made. Residents do not get to pick what unit will be offered to satisfy the requests; Offers are based on the need as approved not on preference."`

75.     Dismissing the medical needs of a terminally-ill young woman as a matter of "preference," CHA never provided Trebora and her mother with a reasonable accommodation.

76.     As a result, for the last two years of Trebora's life, when Trebora was not in-patient, she remained stuck in a second-floor apartment, unable to leave without the help of an ambulance. Rather than being a place of peace and comfort, the apartment only served to amplify the suffering of Trebora and her mother in their time of need.

## COUNT I – FAIR HOUSING ACT

77.     Plaintiff repeats and realleges Paragraphs 1 through 76 as though fully set forth herein.

78.     The Fair Housing Act prohibits discrimination in housing against a disabled person or a person residing or associated with a disabled person. 42 U.S.C. § 3604(f)(1)-(2).

79.     Discrimination includes a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B).

80.     Defendant discriminated against Trebora and her mother by denying them a reasonable accommodation for Trebora's disability, and acted intentionally, willfully, and/or in reckless disregard or the rights of Trebora and her mother.

81.     As a result, Trebora and her mother suffered damages, including pain and suffering, mental anguish, emotional distress, and loss of enjoyment of life.

## COUNT II – REHABILITATION ACT

82.     Plaintiff repeats and realleges Paragraphs 1 through 76 as though fully set forth herein.

83.     The Rehabilitation Act prohibits a unit of local government that receives federal financial assistance from discrimination against a qualified individual on the basis of his or her disability. 29 U.S.C. § 794(a).

84.     Defendant received federal financial assistance and thus is covered by the Rehabilitation Act.

85.     Defendant discriminated against Trebora on the basis of her disability by denying her a reasonable accommodation.

86.     As a result, Trebora suffered damages, including pain and suffering, mental anguish, emotional distress, and loss of enjoyment of life.

## COUNT III – AMERICANS WITH DISABILITIES ACT

87.     Plaintiff repeats and realleges Paragraphs 1 through 76 as though fully set forth herein.

88.     The Americans with Disabilities Act prohibits a public entity from discriminating against an individual by reason of his or her disability. 42 U.S.C. § 12132.

89.     Defendant discriminated against Trebora on the basis of her disability by denying her a reasonable accommodation.

90.     As a result, Trebora suffered damages, including pain and suffering, mental anguish, emotional distress, and loss of enjoyment of life.

### COUNT IV – ILLINOIS HUMAN RIGHTS ACT

91.     Plaintiff repeats and realleges Paragraphs 1 through 76 as though fully set forth herein.

92.     The Illinois Human Rights Act prohibits discrimination in housing against a disabled person or a person residing or associated with a disabled person. 775 ILCS § 5/3-102.1.

93.     Discrimination includes the refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford equal opportunity to use and enjoy a dwelling. 775 ILCS § 5/3-102.1(C)(2).

94.     Defendant discriminated against Trebora and her mother by denying them a reasonable accommodation for Trebora's disability, and acted intentionally, willfully, and/or in reckless disregard or the rights of Trebora and her mother.

95.     As a result, Trebora and her mother suffered damages, including pain and suffering, mental anguish, emotional distress, and loss of enjoyment of life.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor, individually and as administrator of the Estate of Trebora Talbert, and against Defendant, awarding compensatory damages, attorney fees, pre and post-judgment interest, costs, and such other and further relief the Court deems just.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Date: July 26, 2023

Respectfully Submitted,

LYNYA COOPER, *individually and as administrator of the Estate of Trebora Talbert*

By: /s/ Marko Duric

Robert Robertson
Marko Duric
ROBERTSON DURIC
One North LaSalle, Suite 300
Chicago, IL 60602
(312) 223-8600
robrobertson1@sbcglobal.net
marko@robertsonduric.com